1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

ELVARENA VAITOGI,

                 Plaintiff,

     v.

MICHAEL J. ASTRUE[1], Commissioner of
Social Security,

                 Defendant.

CASE NO.     C06-5484FDB-KLS

REPORT AND
RECOMMENDATION

Noted for June 8, 2007

Plaintiff, Elvarena Vaitogi, has brought this matter for judicial review of the denial of her application for disability insurance benefits. This matter has been referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Magistrates Rule MJR 4(a)(4) and as authorized by Mathews, Secretary of H.E.W. v. Weber, 423 U.S. 261 (1976). After reviewing the parties' briefs and the remaining record, the undersigned submits the following Report and Recommendation for the Honorable Franklin D. Burgess' review.

FACTUAL AND PROCEDURAL HISTORY

Plaintiff currently is 55 years old.[2] Tr. 25. She has a general equivalency diploma, two years of

---

[1]Pursuant to Federal Rule of Civil Procedure 25(d)(1), Michael J. Astrue, who recently became acting Commissioner of Social Security, hereby automatically is substituted for Joanne B. Barnhart.

[2]Plaintiff's date of birth has been redacted in accordance with the General Order of the Court regarding Public Access to Electronic Case Files, pursuant to the official policy on privacy adopted by the Judicial Conference of the United States.

REPORT AND RECOMMENDATION
Page - 1

college education and past work experience as a clerk, receptionist and childcare provider. Tr. 19, 63, 68, 71.

On August 30, 2003, plaintiff filed an application for disability insurance benefits, alleging disability as of August 31, 2001, due to high blood pressure, a blocked neck artery on the right side, headaches, blurred vision, left hand and arm numbness, and a speech defect. Tr. 18-19, 53-55, 62. Her application was denied initially and on reconsideration. Tr. 25-27, 31.  A hearing was held before an administrative law judge ("ALJ") on January 30, 2006, at which plaintiff, represented by counsel, appeared and testified, as did a vocational expert. Tr. 206-234.

On March 28, 2006, the ALJ issued a decision, determining plaintiff to be not disabled, finding specifically in relevant part:

(1)     at step one of the disability evaluation process,[3] plaintiff had not engaged in substantial gainful activity since her alleged onset date of disability;

(2)     at step two, plaintiff had "severe" impairments consisting of hypertension and asthma;

(3)     at step three, none of plaintiff's impairments met or equaled the criteria of any of those listed in 20 C.F.R. Part 404, Subpart P, Appendix 1; and

(4)     at step four, plaintiff had the residual functional capacity to perform a modified range of light work, which did not preclude her from performing her past relevant work.

Tr. 23-24.  Plaintiff's request for review was denied by the Appeals Council on June 30, 2006, making the ALJ's decision the Commissioner's final decision. Tr. 4; 20 C.F.R. § 404.981.

On August 23, 2006, plaintiff filed a complaint in this Court seeking review of the ALJ's decision. (Dkt. #1-#3). Specifically, plaintiff argues that decision should be reversed and remanded for an award of benefits or, in the alternative, for further administrative proceedings, for the following reasons:

(a)     the ALJ erred in evaluating the opinion of Dr. Peter Pereira, plaintiff's treating physician;

(b)     the ALJ erred in finding plaintiff's carotid artery occlusion, cerebrovascular disease and recurrent ankle sprains to be not severe;

(c)     the ALJ erred in assessing plaintiff's credibility;

---

[3]The Commissioner employs a five-step "sequential evaluation process" to determine whether a claimant is disabled. See 20 C.F.R. § 404.1520; 20 C.F.R. § 416.920.  If the claimant is found disabled or not disabled at any particular step, the disability determination is made at that step, and the sequential evaluation process ends. Id.

(d)  the ALJ erred in evaluating the lay witness evidence from plaintiff's husband;

(e)  the ALJ erred in assessing plaintiff's residual functional capacity;

(f)  the ALJ erred in finding plaintiff capable of returning to her past relevant work;

(g)  the Commissioner failed to meet his burden of demonstrating that plaintiff is capable of performing other work existing in significant numbers in the national economy; and

(h)  the ALJ erred in failing to obtain testimony from a medical expert.

The undersigned agrees the ALJ erred in determining plaintiff to be not disabled, but, for the reasons set forth below, recommends that while the ALJ's decision should be reversed, this matter should be remanded to the Commissioner for further administrative proceedings.  Although plaintiff requests oral argument in this matter, the undersigned finds such argument to be unnecessary here.

DISCUSSION

This Court must uphold the Commissioner's determination that plaintiff is not disabled if the Commissioner applied the proper legal standard and there is substantial evidence in the record as a whole to support the decision.  Hoffman v. Heckler, 785 F.2d 1423, 1425 (9th Cir. 1986).  Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  Richardson v. Perales, 402 U.S. 389, 401 (1971); Fife v. Heckler, 767 F.2d 1427, 1429 (9th Cir. 1985).  It is more than a scintilla but less than a preponderance.  Sorenson v. Weinberger, 514 F.2d 1112, 1119 n.10 (9th Cir. 1975); Carr v. Sullivan, 772 F. Supp. 522, 524-25 (E.D. Wash. 1991).  If the evidence admits of more than one rational interpretation, the Court must uphold the Commissioner's decision.  Allen v. Heckler, 749 F.2d 577, 579 (9th Cir. 1984).

I.     Plaintiff's Date Last Insured

To be entitled to disability insurance benefits, plaintiff "must establish that her disability existed on or before" the date her insured status expired.  Tidwell v. Apfel, 161 F.3d 599, 601 (9th Cir. 1998); see also Flaten v. Secretary of Health & Human Services, 44 F.3d 1453, 1460 (9th Cir. 1995) (social security statutory scheme requires disability to be continuously disabling from time of onset during insured status to time of application for benefits, if individual applies for benefits for current disability after expiration of insured status).  Plaintiff's date last insured was December 31, 2002. Tr. 25.  Therefore, to be entitled to disability insurance benefits, plaintiff must establish she was disabled prior to or as of that date. Tidwell, 161

1    F.3d at 601.

2    II.    The ALJ's Step Two Analysis Was Proper

3        At step two of the sequential disability evaluation process, the ALJ must determine if an impairment

4    is "severe." Id.  An impairment is "not severe" if it does not "significantly limit" a claimant's mental or

5    physical abilities to do basic work activities. 20 C.F.R. § 404.1520(a)(4)(iii), ( c); Social Security Ruling

6    ("SSR") 96-3p, 1996 WL 374181 *1.  Basic work activities are those "abilities and aptitudes necessary to

7    do most jobs." 20 C.F.R. § 404.1521(b); SSR 85- 28, 1985 WL 56856 *3.

8        An impairment is not severe only if the evidence establishes a slight abnormality that has "no more

9    than a minimal effect on an individual['']s ability to work."  See SSR 85-28, 1985 WL 56856 *3; Smolen v.

10   Chater, 80 F.3d 1273, 1290 (9th Cir. 1996); Yuckert v. Bowen, 841 F.2d 303, 306 (9th Cir.1988).  Plaintiff

11   has the burden of proving that her "impairments or their symptoms affect her ability to perform basic work

12   activities." Edlund v. Massanari, 253 F.3d 1152, 1159-60 (9th Cir. 2001); Tidwell v. Apfel, 161 F.3d 599,

13   601 (9th Cir. 1998).  The step two inquiry described above, however, is a *de minimis* screening device used

14   to dispose of groundless claims.  Smolen, 80 F.3d at 1290.

15       In this case, the ALJ made the following step two determination:

16       The claimant's medical record prior to December 31, 2002, shows no significant
         impairment other than treatment for hypertension and asthma (Exhibit 3f, p. 1) with
17       routine follow-up visits and medications.  There is no evidence that these conditions
         caused any functional limitations and no actual impairment is noted from the disability
18       onset through December 31, 2002. . . .

19       Prior to December 31, 2002, the medical evidence indicates that the claimant has
         hypertension and asthma, impairments that are "severe" within the meaning of the
20       regulations . . .

21   Tr. 20-21.  For the reasons set forth below, the undersigned finds the ALJ's determination here to have

22   been proper.

23       A.    Dr. Pereira's Opinions

24       The ALJ is responsible for determining credibility and resolving ambiguities and conflicts in the

25   medical evidence. Reddick v. Chater, 157 F.3d 715, 722 (9th Cir. 1998).  Where the medical evidence in the

26   record is not conclusive, "questions of credibility and resolution of conflicts" are solely the functions of the

27   ALJ. Sample v. Schweiker, 694 F.2d 639, 642 (9th Cir. 1982).  In such cases, "the ALJ's conclusion must

28   be upheld." Morgan v. Commissioner of the Social Security Administration, 169 F.3d 595, 601 (9th Cir.

1   1999).  Determining whether inconsistencies in the medical evidence "are material (or are in fact

2   inconsistencies at all) and whether certain factors are relevant to discount" the opinions of medical experts

3   "falls within this responsibility." Id. at 603.

4        In resolving questions of credibility and conflicts in the evidence, an ALJ's findings "must be

5   supported by specific, cogent reasons." Reddick, 157 F.3d at 725.  The ALJ can do this "by setting out a

6   detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation

7   thereof, and making findings." Id.  The ALJ also may draw inferences "logically flowing from the evidence."

8   Sample, 694 F.2d at 642.  Further, the Court itself may draw "specific and legitimate inferences from the

9   ALJ's opinion." Magallanes v. Bowen, 881 F.2d 747, 755, (9th Cir. 1989).

10       The ALJ must provide "clear and convincing" reasons for rejecting the uncontradicted opinion of

11  either a treating or examining physician. Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1996).  Even when a

12  treating or examining physician's opinion is contradicted, that opinion "can only be rejected for specific and

13  legitimate reasons that are supported by substantial evidence in the record." Id. at 830-31.  However, the

14  ALJ "need not discuss all evidence presented" to him or her. Vincent on Behalf of Vincent v. Heckler, 739

15  F.3d 1393, 1394-95 (9th Cir. 1984) (citation omitted) (emphasis in original).  The ALJ must only explain

16  why "significant probative evidence has been rejected." Id.; see also Cotter v. Harris, 642 F.2d 700, 706-07

17  (3d Cir. 1981); Garfield v. Schweiker, 732 F.2d 605, 610 (7th Cir. 1984).

18       In general, more weight is given to a treating physician's opinion than to the opinions of those who

19  do not treat the claimant. Lester, 81 F.3d at 830.  On the other hand, an ALJ need not accept the opinion of

20  a treating physician, "if that opinion is brief, conclusory, and inadequately supported by clinical findings" or

21  "by the record as a whole." Batson v. Commissioner of Social Security Administration, 359 F.3d 1190,

22  1195 (9th Cir.,2004); Thomas v. Barnhart, 278 F.3d 947, 957 (9th Cir. 2002); Tonapetyan v. Halter, 242

23  F.3d 1144, 1149 (9th Cir. 2001).  An examining physician's opinion is "entitled to greater weight than the

24  opinion of a nonexamining physician." Lester, 81 F.3d at 830-31.  A non-examining physician's opinion may

25  constitute substantial evidence if "it is consistent with other independent evidence in the record." Id. at 830-

26  31; Tonapetyan, 242 F.3d at 1149.

27       On November 5, 2003, plaintiff's treating physician, Peter Pereira, M.D., wrote a letter in which he

28  opined in relevant part as follows:

REPORT AND RECOMMENDATION
Page - 5

Elvarena Vaitogi has been a patient of mine . . . for three years, and requests that I write a letter detailing her medical condition. She has recently suffered a transient ischemic attack (TIA) in July '03 due to blocked carotid arteries. She is not a candidate for surgery, and will need to take blood-thinning medication for life. She will also need periodic ultrasonic examinations of her left carotid artery to monitor the partial occlusion there. Her right carotid is completely occluded.

Elvarena also has hypertension and a history of tobacco use; therefore, she remains at high risk for another TIA or stroke. Her neurologist and I have advised her not to work in this unstable condition. Please consider her inability to work when she is applying for assistance.

Tr. 120. Dr. Pereira wrote another letter, dated February 23, 2004 in which he again opined:

Elvarena had a mini-stroke (transient ischemic attack/TIA) July 14th, 2003. Her poorly controlled blood pressure, and long history of tobacco abuse, were probably primary factors that led to her development of cerebrovascular disease and stroke. She had symptoms that were probably suggestive of her impending stroke risk as early as 2001-02.

Elvarena continues to have daily episodes of vision loss and left sided weakness, related to her cerebrovascular disease. These are position related. She had another small stroke on 2-6-04, for which she was seen and treated . . . Her Neurologist, Dr. Jon Kooiker . . . has told her that she is very high risk to have another stroke with even minimal work-related activity, and has therefore recommended that she not work . . . , and I agree with this assessment.

Tr. 118.

The ALJ addressed the opinions contained in the above two letters as follows:

[The November 5, 2003 letter from Dr. Pereira] dates her incapacity from the TIA in July 2003 (Exhibit 3F, p. 3). I have given this treating doctor's statement significant probative weight. Additionally, Dr. Pereira's letter of February 23, 2004, lists her previous diagnoses as, High Blood Pressure, severe and difficult to control, as well as Reactive Airway Disease/Asthma, mild and intermittent. He also notes her TIA in July 2003 but states, "She had symptoms that were *probably suggestive of her* impending *stroke risk* as early as 2001-02." (emphasis added) (Exhibit 3F, p.1) While I give significant weight to this letter, neither this statement, nor the record indicates that these symptoms, ". . . probably suggestive of impending stroke risk" resulted in any functional impairment during the relevant period, let alone disability. Two things must be noted here: first, the fact that the claimant may have had a "risk" of stroke, without more, does not constitute even a severe impairment, and; second, the claimant's TIA in July 2003 had a sudden onset, as noted in her hospital admission report . . .

Tr. 20. Plaintiff argues that in so finding, the ALJ failed to give proper weight to Dr. Pereira's opinions. The undersigned disagrees.

Plaintiff does not dispute that it was proper for the ALJ to give significant weight to Dr. Pereira's opinion that she could not work as of July 2003 due to her TIA. Plaintiff does argue, however, that it was error for the ALJ to fail to realize that Dr. Pereira was discussing her current medical status only, and that he was not asked to state his opinion regarding her functional abilities during the period between August

2001 and July 2003.  As such, plaintiff asserts, neither of the opinions provided by Dr. Pereira show she was not disabled, and thus had no severe stroke-related impairment, prior to July 2003.  The undersigned finds this argument to be disingenuous and therefore wholly unpersuasive.

The whole point of the ALJ's discussion concerning Dr. Pereira's opinions and plaintiff's stroke-related symptoms was to show the lack of objective medical evidence in the record indicating that those symptoms had resulted in any significant functional impairment prior to July 2003.  Contrary to plaintiff's assertion, it is the fact that Dr. Pereira provided no opinion or clinical findings to suggest otherwise that is most relevant here.  This is because plaintiff has the burden of proof at step two to show she suffers from a severe impairment.  See Edlund, 253 F.3d at 1159-60; Tidwell, 161 F.3d at 601.  That is, she must come forward with objective medical evidence that her stroke-related symptoms affected her ability to perform basic work activities prior to her date last insured.  Plaintiff has not done so here.

Plaintiff argues the ALJ's statement that the record contains no evidence that she had any functional limitations prior to December 31, 2002, is incorrect.  For example, she points to the fact that she had been diagnosed with hypertension under borderline control.  See Tr. 131, 143, 153.  That impairment, however, constitutes a separate diagnosis from that of plaintiff's stroke and other cerebrovascular-related symptoms.  In any event, as noted above, the ALJ did find plaintiff's hypertension to be severe.  Plaintiff also points to various self-reports regarding her stroke-related symptoms she made prior, or which dated back, to her date last insured.  At step two though, while a claimant's pain and other symptoms must be taken into account (see 20 C.F.R. § 404.1529), the severity determination is made solely on the basis of the objective medical evidence in the record:

> A determination that an impairment(s) is not severe requires a careful evaluation of the medical findings which describe the impairment(s) and an informed judgment about its (their) limiting effects on the individual's physical and mental ability(ies) to perform basic work activities; thus, an assessment of function is inherent in the medical evaluation process itself.  At the second step of sequential evaluation, then, medical evidence alone is evaluated in order to assess the effects of the impairment(s) on ability to do basic work activities.  If this assessment shows the individual to have the physical and mental ability(ies) necessary to perform such activities, no evaluation of past work (or of age, education, work experience) is needed.  Rather, it is reasonable to conclude, based on the minimal impact of the impairment(s), that the individual is capable of engaging in SGA.

SSR 85-28, 1985 WL 56856 *4 (emphasis added).

Plaintiff next points to a July 18, 2003 carotid artery duplex study showing "[f]indings consistent with occlusion of the right internal carotid artery" and "[m]ild . . . stenosis of the left internal carotid

artery." Tr. 105.  This level of occlusion and stenosis, plaintiff asserts, did not arise overnight.  Rather, she claims quite likely those impairments were present to a considerable extent prior to December 31, 2002. Were the Court to adopt this view, it in effect would be acting as its own medical expert, something which the ALJ certainly may not, and the Court should not, do.  See McBrayer v. Secretary of Health and Human Services, 712 F.2d 795, 799 (2nd Cir. 1983) (ALJ cannot arbitrarily substitute own judgment for competent medical opinion); Whitney v. Schweiker, 695 F.2d 784, 788 (7th Cir. 1982) (ALJ should avoid commenting on meaning of objective medical findings without supporting medical expert testimony).

In any event, the mere existence of an impairment, e.g. artery occlusion and/or stenosis, in itself is insufficient to establish severity at step two of the sequential disability evaluation process.  Thus, even if plaintiff did have these conditions prior to December 31, 2002, there is no objective medical evidence in the record that they had more than a minimal effect on her ability to perform basic work activities at any time prior to her date last insured.  Similarly, plaintiff's assertion that the ALJ erred in failing to fully credit Dr. Pereira's opinion that she had experienced symptoms suggestive of her impending stroke risk as early as 2001-2002 is equally without merit.  That is, again, nothing in that opinion shows those symptoms had resulted in any significant work-related limitations during the relevant time period.

B.     Plaintiff's Carotid Artery Occlusion, Cerebrovascular Disease and Recurrent Ankle Sprains

Plaintiff argues the ALJ erred in failing to find her carotid artery occlusion, cerebrovascular disease and recurrent ankle sprains constituted severe impairments prior to her date last insured.  Specifically, she argues the objective medical evidence from Dr. Pereira and Jon C. Kooiker, M.D., her neurologist, her own testimony and the lay witness evidence from her husband, discussed below, can only reasonably support a finding that these impairments were severe prior to December 31, 2002.  As discussed above, however, the ALJ's step two severity inquiry is limited only to consideration of the objective medical evidence in the record.  As such, the ALJ is not required to consider plaintiff's testimony and the statement submitted by her husband at this step.

Also as discussed above, the objective medical evidence obtained from Dr. Pereira fails to show any significant work-related limitations resulted from plaintiff's carotid artery occlusion or cerebrovascular disease prior to her date last insured.  Dr. Kooiker did opine in late January 2004, that plaintiff had a right carotid artery occlusion, with "daily episodes of vision loss" and left-sided weakness. Tr. 160.  He further

stated that these were "position related," that he did not feel she was employable, and that most work activity presented her with "some risk of stroke." Id.  In late March 2004, Dr. Kooiker again noted plaintiff had left-sided weakness and sensory loss, with rare episodes of blindness in her right eye, due to her artery occlusion. Tr. 159.  He deemed her permanently disabled, with an onset date of July 14, 2003.  Clearly, these opinions concern the period subsequent to mid-July 2003, and thus provide no findings with respect to plaintiff's functional capabilities prior to late December 2002.

Plaintiff further argues the ALJ erred in confusing the actual TIA event that occurred in July 2003, with the cerebrovascular disease process and carotid artery occlusion that caused the TIA in finding there to be no evidence of impairment-related function prior to December 31, 2002.  Even if this disease process is as easily separable from the TIA itself as plaintiff has made it out to be, still, as explained above, she has presented no objective medical evidence of work-related limitations, significant or otherwise, prior to her date last insured.  Plaintiff once more asserts the ALJ was required to consider her own testimony and that of her husband on this issue.  Once again, however, such evidence does not come into play at step two of the sequential disability evaluation process.  Plaintiff's point here, therefore, is without merit.

Finally, plaintiff argues she complained of problems with her right ankle swelling and with walking prior to her date last insured.  Once more, plaintiff must present objective medical evidence to survive the step two severity determination.  She has not done so.  Plaintiff does point to an April 18, 2003 treatment note, in which Dr. Pereira described her right ankle as being moderately swollen and painful with weight bearing and diagnosed her with "[s]prain – recurrent." Tr. 127.  This treatment note, however, is dated some three and a half months after her insured status expired, and there is no indication in that note as to how long she had been experiencing strains.  That note, furthermore, fails to show the swelling and sprains in any way limited her ability to do basic work activities.

III.    The ALJ Erred in Assessing Plaintiff's Credibility

Questions of credibility are solely within the control of the ALJ.  Sample v. Schweiker, 694 F.2d 639, 642 (9th Cir. 1982).  The Court should not "second-guess" this credibility determination.  Allen, 749 F.2d at 580.  In addition, the Court may not reverse a credibility determination where that determination is based on contradictory or ambiguous evidence.  Id. at 579.  That some of the reasons for discrediting a claimant's testimony should properly be discounted does not render the ALJ's determination invalid, as long

1    as that determination is supported by substantial evidence. Tonapetyan v. Halter, 242 F.3d 1144, 1148 (9th

2    Cir. 2001).

3        To reject a claimant's subjective complaints, the ALJ must provide "specific, cogent reasons for the

4    disbelief." Lester v. Chater, 81 F.3d 821, 834 (9th Cir. 1996) (citation omitted).  The ALJ "must identify

5    what testimony is not credible and what evidence undermines the claimant's complaints." Id.; Dodrill v.

6    Shalala, 12 F.3d 915, 918 (9th Cir. 1993).  Unless affirmative evidence shows the claimant is malingering,

7    the ALJ's reasons for rejecting the claimant's testimony must be "clear and convincing." Lester, 81 F.2d at

8    834.  The evidence as a whole must support a finding of malingering. O'Donnell v. Barnhart, 318 F.3d 811,

9    818 (8th Cir. 2003).

10       In determining a claimant's credibility, the ALJ may consider "ordinary techniques of credibility

11   evaluation," such as reputation for lying, prior inconsistent statements concerning symptoms, and other

12   testimony that "appears less than candid." Smolen v. Chater, 80 F.3d 1273, 1284 (9th Cir. 1996).  The ALJ

13   also may consider a claimant's work record and observations of physicians and other third parties regarding

14   the nature, onset, duration, and frequency of symptoms. Id.

15       Here, the ALJ explained his basis for not finding plaintiff to be totally credible in relevant part as

16   follows:

17       The claimant testified that she was having problems with numbness in her head,
         confusion, and ambulation difficulties prior to December 2002.  Unfortunately, there is
18       no record of these symptoms recorded in the treatment records.  The first indication of
         disability due to this impairment in the claimant's file is [the November 5, 2003 letter
19       from Dr. Pereira] . . .

20       . . .

21       In August 2003, the claimant sent a letter to Dr. Pereira and noted that she had
         symptoms of fatigue, shortness of breath, pressure in her head since January 2003
22       (Exhibit 3F, p. 30), but this is the first mention of these symptoms in the file.  There is
         also an undated check form indicating some of these symptoms but no indication of
23       where, when, how often, or over what period of time the claimant had these problems.
         (Exhibit 3F, p. 35).  The letter attached to the form (Exhibit 3F, p. 34) does not note
24       these symptoms at all, but rather is focused on complaints of a rash, and I think that in
         all probability they would be noted if they were causing her to be impaired, or disabled,
25       as alleged.  I find the claimant's testimony unsupported by the record. . . .

26       . . .

27       In the context of disability reports and questionaires, the claimant alleged that she is
         unable to work because of severe high blood pressure and the residuals from a stroke
28       (Exhibit 1E, p. 2).  She reported many difficulties due to dizziness, weakness, and
         numbness in her body secondary to a TIA (Exhibit 3E).  Most of her complaints

REPORT AND RECOMMENDATION
Page - 10

followed the date last insured, secondary to stroke, as indicated in the earlier discussion of the medical record.  Prior to December 31, 2002, the allegations of the claimant are credible only to the level of limitations supported by the findings established in the decision.  Her allegations are not entirely consistent with the evidence presented . . .

In making this determination, it is specifically noted that the medical evidence does not support the claimant's ongoing allegations of significant limitations prior to her date last insured of December 31, 2002.  The evidence shows a history of hypertension stable on medications as of May 2002 (Exhibit 3F, p. 18).  In May 2002, the claimant was only using abuterol two times per week for treatment of asthma.  I note that the asthmatic symptoms were worse "when painting apartment building."  No functional limitations were imposed by the treating doctor (Exhibit 3F, p. 37).  She also complained of pain in the shoulders, right hip, and right leg occurring several times per week with stiffness in the morning, and this got better as the day progressed.  This condition was not diagnosed (Exhibit 3F, p. 37).  In October 2002, she complained of skin rash (Exhibit 3F, p. 34), and this was resolved without functional limitations noted.

On July 14, 2003, the claimant was seen in the hospital emergency with left-sided weakness and diagnosed with TIA, possible hypertensive symptoms, and possible carpal tunnel syndrome (Exhibit 1F, p. 1).  At that time, a probable negative CT of the head showed low density at the right temporoparietal junction (Exhibit 1F, p. 5).  On July 18, 2003, a carotid artery duplex was consistent with occlusion of the right internal carotid artery, and mild stenosis of the left internal carotid artery (Exhibit 1F, p. 3).  The claimant testified that she continues to have TIAs sometimes three to four times and up to ten times per day, and it takes an hour to recover from these.  While the evidence shows that the claimant has significant residuals following the TIA of July 2003, this is not relevant to the initial disability determination, as it is after the date her insured status expired on December 31, 2002.  The claimant's testimony did not cover much in the way of significant problems before December 31, 2002, as discussed earlier in the medical discussion.

Tr. 20-22.  Plaintiff argues that because the ALJ essentially provided only one reason for not finding her to be fully credible, namely that her pain and symptom testimony was inconsistent with the medical evidence in the record, his credibility determination was improper.  The undersigned agrees.

An ALJ's determination that a claimant's complaints are "inconsistent with clinical observations" can satisfy the clear and convincing requirement.  Regennitter v. Commissioner of SSA, 166 F.3d 1294, 1297 (9th Cir. 1998).  However, a claimant's pain testimony may not be rejected "solely because the degree of pain alleged is not supported by objective medical evidence." Orteza v. Shalala, 50 F.3d 748, 749-50 (9th Cir. 1995) (quoting Bunnell v. Sullivan, 947 F.2d 341, 346-47 (9th Cir.1991) (en banc)) (emphasis added); see also Rollins v. Massanari, 261 F.3d 853, 856 (9th Cir.2001); Fair v. Bowen, 885 F.2d 597, 601 (9th Cir. 1989).  The same is true with respect to a claimant's other subjective complaints. See Byrnes v. Shalala, 60 F.3d 639, 641-42 (9th Cir. 1995) (finding that while holding in Bunnell was couched in terms of subjective complaints of pain, its reasoning extended to claimant's non-pain complaints as well).

In reviewing the ALJ's credibility determination as a whole, the undersigned finds it to largely be

couched in terms of being unsupported by the medical evidence in the record.  As noted above, while this can be a valid basis for discounting a claimant's credibility, it cannot be the sole basis.  Defendant argues the ALJ committed no error here.  Specifically, defendant first asserts plaintiff has failed to meet even the threshold test set out in Cotton v. Bowen, 799 F.2d 1403 (9th Cir. 1986).  The Ninth Circuit has described this threshold test as requiring that the claimant "produce medical evidence of an underlying impairment which is reasonably likely to be the cause of the alleged pain." Bunnell, 947 F.2d at 343.  Defendant thus claims plaintiff has not even shown an underlying impairment.

The undersigned finds defendant's argument to be without merit.  Defendant points to the ALJ's determination that the medical evidence in the record concerning the period prior to plaintiff's date last insured fails to support a reasonable inference that her alleged symptoms corresponded with her July 2003 TIA.  In other words, defendant focuses on the ALJ's determination that plaintiff had no severe stroke-related impairment prior to December 31, 2002, a finding with respect to which, as discussed above, the undersigned found no error.  Also as noted above, however, the ALJ did find plaintiff's hypertension to constitute a severe impairment, and thus moved on with the sequential disability evaluation process.  This is a medically determinable impairment that it would seem reasonably could cause the symptoms alleged.  Indeed, in her application for disability benefits, plaintiff claimed she suffered from disabling symptoms at least in part due to "[s]evere high blood pressure." Tr. 62.

Defendant next argues that even assuming plaintiff meets the threshold Cotten test, the ALJ gave other valid reasons for discounting her credibility, and did not merely rely on a finding of inconsistency with the medical evidence in the record.  For example, defendant states the ALJ properly noted the paucity of contemporaneous medical evidence indicating she was treated for her complaints of dizziness, pressure in her head, left-sided weakness, or need for assistance from her husband prior to her date last insured. See Burch v. Barnhart, 400 F.3d 676, 681 (9th Cir. 2005) (upholding ALJ's discounting claimant's credibility in part due to lack of consistent treatment, and noting that fact that claimant's pain was not sufficiently severe to motivate her to seek treatment, even if she had sought some treatment, was powerful evidence regarding extent to which she was in pain).  The only express statement the ALJ made regarding treatment, however, was to note that plaintiff "was only using abuterol two times per week" for her asthma, and, even then, this was done in the context of discussing the lack of objective medical evidence in the record. Tr. 21.

REPORT AND RECOMMENDATION
Page - 12

Defendant also points to the ALJ's observation that any complaints plaintiff expressed concerning the above symptoms, occurred well after her date last insured in conjunction with her TIA. Again, though, as set forth above, the comments made by the ALJ in this regard appear to have been made in the context of showing the lack of objective medical evidence in the record supporting plaintiff's complaints. Even if this is viewed as a separate basis for discounting plaintiff's credibility, however, those comments are not entirely correct. For example, while the ALJ stated that the first mention of those symptoms came in an August 2003 letter plaintiff sent to Dr. Pereira, it seems mention of them indeed was made prior to her date last insured.[4] See, e.g., Tr. 140, 152-53. In addition, Dr. Pereira himself noted that she "had symptoms that were probably suggestive of her impending stroke risk as early as 2001-02." Tr. 118.

Accordingly, although such evidence may not be enough to support a finding of disability, let alone severity as discussed above, the ALJ's statement that it is not found in the record is erroneous. In addition, it is true that an ALJ may use "ordinary techniques of credibility evaluation" when evaluating a claimant's credibility. Smolen, 80 F.3d at 1284. However, the mere fact that the record does not contain much in the way of statements from plaintiff concerning her symptoms prior to her date last insured, does not in itself show the testimony she gave at the hearing was false or inconsistent. Indeed, testimony cannot be found to be inconsistent if there are no inconsistent prior statements with which to compare it.

Lastly, defendant asserts the ALJ found plaintiff's hearing testimony regarding her symptoms and limitations prior to her date last insured was inconsistent with the "evidence" of record. It is true that the ALJ stated that plaintiff's allegations were "not entirely consistent with the evidence presented." Tr. 21. However, other than discussing the objective medical evidence in the record, or, rather, lack thereof, to support her allegations, the ALJ pointed to no other specific evidence to support his statement. Thus, defendant's further claim that the record contains evidence of plaintiff's work history and daily activities that are at odds with her allegations of disabling limitations is not a proper basis for upholding the ALJ's determination, as the ALJ did not rely on such evidence as a specific reason for discounting her credibility. See Pinto v. Massanari, 249 F.3d 840 (9th Cir. 2001) ("[W]e cannot affirm the decision of an agency on a ground that the agency did not invoke in making its decision.").

---

[4]The "undated check form indicating some of these symptoms" to which the ALJ refers in his decision, actually appears to have been made on October 18, 2002. See Tr. 152-53.

IV.    The Declaration of Mr. Vaitogi Submitted by Plaintiff

Lay testimony regarding a claimant's symptoms "is competent evidence that an ALJ must take into account," unless the ALJ "expressly determines to disregard such testimony and gives reasons germane to each witness for doing so." Lewis v. Apfel, 236 F.3d 503, 511 (9th Cir. 2001).  An ALJ may discount lay testimony if it conflicts with the medical evidence. Id.; Vincent v. Heckler, 739 F.2d 1393, 1395 (9th Cir. 1984) (proper for ALJ to discount lay testimony that conflicts with available medical evidence).  In rejecting lay testimony, the ALJ need not cite the specific record as long as "arguably germane reasons" for dismissing the testimony are noted, even though the ALJ does "not clearly link his determination to those reasons," and substantial evidence supports the ALJ's decision. Lewis, 236 F.3d at 512.  The ALJ also may "draw inferences logically flowing from the evidence." Sample, 694 F.2d at 642.

Plaintiff argues the ALJ erred by failing to properly consider the declaration concerning plaintiff's symptoms and limitations supplied by Vaitogi Vaitogi, plaintiff's husband.  In that declaration, Mr. Vaitogi stated he remembered that during 2001 and 2002, plaintiff experienced a variety of mental and physical problems, including: poor sleep due to her head hurting; pain in her shoulders and in her left side "from the arm down to her leg"; an inability to work because of "too much pressure on her had"; confusion and loss of memory; ankle sprains; difficulties in going up and down the stairs; and dizziness. Plaintiff's Opening Brief, Appendix 1, p. 2.  Mr. Vaitogi's declaration was not included in the administrative record, nor did the ALJ address it in his decision, even though the ALJ was told by plaintiff's counsel at the hearing that he would be submitting such a declaration (Tr. 231), and it appears a copy of it was faxed to the attention of the ALJ at the Office of Hearings and Appeals nearly two months prior to the date of the ALJ's decision. Plaintiff's Opening Brief, Appendix 1, p. 1.

Defendant recognizes that plaintiff attempted to have the declaration added to the record, but that for whatever reason, it was not accomplished.  Nevertheless, defendant argues that since the declaration was never made part of the record, the ALJ clearly did not have the opportunity to consider it.  Defendant further argues that the administrative record is complete and should not be supplemented.  This is because, defendant asserts, adding the declaration, or other documents, to the record at this stage of the proceedings would make the record inaccurate, as any such additional documents were not part of the record on which the ALJ's and the Appeals Council's decisions were based.

Plaintiff counters that defendant has no factual basis for asserting that the ALJ did not have an opportunity to consider the declaration.  She asserts the ALJ knew about the evidence, because he was told about the declaration at the hearing and asked that it be faxed to him.  In addition, plaintiff argues that if the faxed declaration was lost upon receipt at the ALJ's office, the ALJ could have contacted her attorney to request another copy of it.  Instead, plaintiff states the ALJ simply failed to mention it, which she asserts is clear legal error.

First, it is true, as noted above, that plaintiff's attorney informed the ALJ at the end of the hearing that he had a declaration from Mr. Vaitogi that he planned to submit. Tr. 231.  The record, however, does not definitively show that the ALJ specifically asked to have that declaration faxed to him.  Rather, at the very beginning of the hearing, the ALJ expressed "the understanding" that plaintiff's attorney had "some additional exhibits" to add after the hearing. Tr. 209.  Then again, at the end of the hearing, plaintiff's attorney stated he was going to "submit the additional records," which apparently included both updated medical records and the aforementioned declaration, for the ALJ's review, to which the ALJ replied, "[a]ll right." Tr. 230-32.  Thus, it was plaintiff's attorney who offered the declaration, and the ALJ merely held open the record to allow for its submission.

Second, while it appears clear that plaintiff's attorney did fax a copy of the declaration to the Office of Hearings and Appeals, at the attention of the ALJ, it is not at all clear what happened to it subsequently, except that it was not included in the record.  Plaintiff argues defendant has no factual basis for asserting the ALJ had no opportunity to consider the declaration, but then, using the same line of reasoning, neither does plaintiff for asserting that the ALJ did have such an opportunity.  The only thing that can be agreed on is that something happened to the faxed declaration after plaintiff's attorney faxed it.  However, there are several plausible explanations as to how the ALJ may not have received any notice of the fax.

Thus, for example, the fax machine at the Office of Hearings and Appeals could have experienced a loss of power or other malfunction, causing the electronic record of the fax to be lost.  An employee of the Office of Hearings and Appeals other than the ALJ in this case could have misplaced or otherwise lost the faxed declaration.  The point is, there is no evidence that while the facsimile appeared to have been sent successfully by plaintiff's attorney, it was successfully received at the other end, or that if it was, it made its way to the particular ALJ who had responsibility for deciding this matter.  The fact that the ALJ may have

REPORT AND RECOMMENDATION
Page - 15

been informed that plaintiff's attorney intended to submit the declaration also does not necessarily show fault on the part of the ALJ. This is because, given the likely large volume of disability applications each ALJ must consider, the probability of the ALJ being able to remember every additional document he was told in a hearing would be submitted is not particularly high.

Accordingly, plaintiff's claim that the ALJ could have contacted her attorney if the declaration had been lost is not especially persuasive. That is, if, as discussed above, it was not lost by the ALJ, and if he was not informed of its loss, the ALJ would never know to request another copy. Therefore, while it may be that fault lies with the Office of Hearings and Appeals for the declaration's loss, or for the fact that it was not ultimately included in the record, nothing specifically ties that fault to the ALJ. Indeed, plaintiff does not explain why, if she felt the declaration was of particular importance to her, that she did not contact the Office of Hearings and Appeals after her attorney faxed it to ensure that it properly was received. Nor does plaintiff explain why, after it was not included in the record and the ALJ failed to mention it in his decision, she did not re-submit it to the Appeals Council for its review. In other words, it appears plaintiff herself partly may be to blame here.

Plaintiff next argues that not allowing the record to be supplemented when the ALJ knew about Mr. Vaitogi's declaration and it was received by the Office of Hearings and Appeals violates her constitutional right to due process. She asserts the ALJ cannot simply ignore evidence by failing to list it as an exhibit. As explained above, however, plaintiff has failed to show fault on the part of the ALJ or that she herself is completely free of blame on this issue.[5] Nevertheless, the declaration does constitute additional evidence that has been submitted pursuant to plaintiff's request for judicial review, with respect to which 42 U.S.C. § 405(g) provides a mechanism for determining whether it should be considered by the Court. The parties, not surprisingly, differ on the appropriateness of applying 42 U.S.C. § 405(g) to this case, and whether the declaration supports a reversal and remand of this matter.

Under sentence six of 42 U.S.C. § 405(g), the Court "may at any time order additional evidence to

---

[5]Plaintiff also argues the ALJ's alleged error here was compounded by the Appeals Council's failure to comply with her written request for a tape of her hearing. This too, she asserts, violated her due process rights as well. Plaintiff does not explain exactly how her due process rights were violated. Regardless, while the record does show she made such a request (Tr. 10), there is no indication that the Appeals Council failed to comply with that request. In addition, even if the Appeals Council did fail to provide the requested tape after her initial request, plaintiff does not explain why she did not follow-up during the time between the date she made her request and the date the Appeals Council denied her request for review, a period of more than a month. Again, plaintiff has not shown entirely clean hands here.

REPORT AND RECOMMENDATION
Page - 16

be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding."  Under this standard, to justify remand, the claimant must show that the evidence is both "new" and "material" to determining disability, and that he or she "had good cause for having failed to produce that evidence earlier." <u>Mayes v. Massanari</u>, 276 F.3d 453, 462 (9th Cir. 2001).  To be material, that evidence "must bear 'directly and substantially on the matter in dispute.'" <u>Id.</u> (citation omitted).  The claimant also must demonstrate a "reasonable possibility" that the new evidence "would have changed the outcome of the administrative hearing." <u>Id.</u> (citation omitted).  To demonstrate "good cause," the claimant must show the new evidence "was unavailable earlier." <u>Id.</u> at 463.  The good cause requirement will not be met by "merely obtaining a more favorable report once his or her claim has been denied." <u>Id.</u>

Plaintiff argues that the declaration is not new as the ALJ knew about it and the Office of Hearings and Appeals possessed it.  Again, however, as discussed above, plaintiff has failed to demonstrate fault on the part of the ALJ or to show the Office of Hearings and Appeals had actual possession of it.  Further, the evidence is "new", at least in the sense that no showing has been made that either the ALJ or the Appeals Council in fact saw, let alone considered, it, and that it was never made part of the record.  Accordingly, the undersigned finds that the declaration to be "new" for purposes of 42 U.S.C. § 405(g), even though it was signed and dated by Mr. Vaitogi four days before the date of the hearing.

Defendant argues the declaration is not "material" because it is not competent medical evidence that may be accepted to attribute the symptoms plaintiff had prior to her date last insured to her July 2003 TIA.  Plaintiff argues that it is material, because lay evidence may be considered for purposes of inferring a claimant's disability onset date pursuant to Social Security Ruling ("SSR") 83-20, 1983 WL 31249.  Both of these arguments are off the mark.  First, SSR 83-20, which sets forth the Commissioner's policy when establishing the onset date of disability, is inapplicable here, as it comes into play only <u>after</u> the claimant has met the "ultimate burden" of proving disability prior to the expiration of his or her insured status.  <u>Armstrong v. Commissioner of the Social Security Administration</u>, 160 F.3d 587, 590 (9th Cir. 1998).  In other words, it is only when the claimant has established disability <u>and</u> the "record is ambiguous as to the onset date of disability," that SSR 83-20 requires the ALJ to "assist the claimant in creating a complete record" that "forms a basis for" establishing a disability onset date. <u>Id.</u>

As noted above, however, lay evidence regarding a claimant's symptoms "is competent evidence that an ALJ must take into account," unless the ALJ "expressly determines to disregard such testimony and gives reasons germane to each witness for doing so." Lewis, 236 F.3d at 511.  Thus, unless such evidence is properly discredited, it must be considered in determining a claimant's ability to work, at least at steps four and five of the sequential disability evaluation process, even though it may not constitute competent medical evidence as pointed out by defendant.  Here, for example, Mr. Vaitogi sets forth in his declaration his observations of plaintiff's mental and physical limitations during the years 2001 and 2002, which clearly bear "directly and substantially" on her allegations of disabling impairments and symptoms during the relevant time period. Mayes, 276 F.3d at 462.

There also is a "reasonable possibility" that the declaration "would have changed the outcome of the administrative hearing." Id.  While the statements contained in Mr. Vaitogi's declaration may not be used to attribute the symptoms plaintiff had prior to her date last insured to her July 2003 TIA, as argued by defendant, at least some of the observations he provided certainly may bear on at least one of the impairments the ALJ did find to be severe from during that period, namely her hypertension.  For example, it is entirely possible that the pain and pressure in plaintiff's head, the pain in the left side of her body and her dizziness were due at least in part to her hypertension.  Had the ALJ considered this lay evidence, the undersigned cannot say it would not have changed the ALJ's residual functional capacity assessment or his ultimate determination regarding plaintiff's disability.

Finally, with respect to the issue of good cause, it is clear that the declaration was available far in advance of the issuance of the ALJ's decision, and even prior to the hearing for that matter.  While it also is clear that plaintiff attempted to submit her husband's declaration shortly after the hearing by having her attorney fax it to the Office of Hearings and Appeals, as discussed above, it seems plaintiff made no further attempt to ensure either the ALJ or the Appeals Council actually received it.  Accordingly, the undersigned finds plaintiff has not shown "good cause" for submitting it now to the Court for the purposes of judicial review, and yet arguing that the ALJ should have but did not consider it earlier.  Nevertheless, because, as explained below, the undersigned is recommending that this matter be remanded to the Commissioner for further administrative proceedings in light of the ALJ's errors in assessing plaintiff's credibility, on remand Mr. Vaitogi's declaration should be considered as well.

REPORT AND RECOMMENDATION
Page - 18

1    V.    The ALJ Erred in Assessing Plaintiff's Residual Functional Capacity

2          If a disability determination "cannot be made on the basis of medical factors alone at step three of

3    the evaluation process," the ALJ must identify the claimant's "functional limitations and restrictions" and

4    assess his or her "remaining capacities for work-related activities." SSR 96-8p, 1996 WL 374184 *2.  A

5    claimant's residual functional capacity assessment is used at step four to determine whether he or she can do

6    his or her past relevant work, and at step five to determine whether he or she can do other work. Id.  It thus

7    is what the claimant "can still do despite his or her limitations." Id.

8          A claimant's residual functional capacity is the maximum amount of work the claimant is able to

9    perform based on all of the relevant evidence in the record. Id.  However, a claimant's inability to work

10   must result from his or her "physical or mental impairment(s)." Id.  Thus, the ALJ must consider only those

11   limitations and restrictions "attributable to medically determinable impairments." Id.  In assessing a

12   claimant's residual functional capacity, the ALJ also is required to discuss why the claimant's "symptom-

13   related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the

14   medical or other evidence." Id. at *7.

15         In this case, the ALJ assessed plaintiff with the following residual functional capacity:

16         [G]iving the claimant the benefit of the doubt for the period in question from August 31,
           2001 through December 31, 2002, I find that the record is consistent with the following
17         residual functional capacity.  The claimant retained the ability to lift and carry up to 10
           pounds frequently and up to 20 pounds occasionally.  She could sit, stand, and walk for
18         about 6 hours in an 8-hour workday.  She could occasionally climb stairs but could not
           climb on ladders and could not balance.  She was also is [sic] restricted from working at
19         heights and around hazardous machinery.

20   Tr. 22.  Plaintiff argues this assessment was improper, because the ALJ erred in failing to properly consider

21   the opinion of Dr. Pereira, to fully consider her own testimony about her symptoms and limitations, and to

22   consider the declaration of her husband.

23         As discussed above, the only error the ALJ made here was in assessing plaintiff's credibility.  The

24   ALJ did not err in evaluating the opinion of Dr. Pereira or in failing to properly consider Mr. Vaitogi's

25   declaration, even though, also as discussed above, it is recommended that on remand the Commissioner

26   consider that lay evidence as well.  On the other hand, because, as explained above, the ALJ did err in

27   assessing plaintiff's credibility, it is not clear that the ALJ's assessment of her residual functional capacity

28   includes all of her functional limitations.  It is for that reason only that the undersigned finds the ALJ erred

REPORT AND RECOMMENDATION
Page - 19

1    in assessing plaintiff's residual functional capacity.

2    VI.      The ALJ Erred in Finding Plaintiff Capable of Performing Her Past Relevant Work

3            Plaintiff has the burden at step four of the disability evaluation process to show that she is unable to

4    return to her past relevant work. Tackett v. Apfel, 180 F.3d 1094, 1098-99 (9th Cir. 1999).  Here, the ALJ

5    found that in plaintiff's "former jobs, as generally performed in the national economy, she was not required

6    to perform work activities beyond" the residual functional capacity with which he assessed her. Tr. 23.

7    Plaintiff argues the ALJ erred in finding her able to perform those jobs, as his assessment was based on an

8    erroneous residual functional capacity assessment.  The undersigned agrees.  Because, as discussed above, it

9    is not clear that the ALJ's residual functional capacity assessment included all of plaintiff's functional

10    limitations, it also is not clear she would be able to perform any of her past relevant work.

11    VII.     Plaintiff's Step Five Argument

12            If a claimant cannot perform his or her past relevant work, at step five of the disability evaluation

13    process the ALJ must show there are a significant number of jobs in the national economy the claimant is

14    able to do. Tackett v. Apfel, 180 F.3d 1094, 1098-99 (9th Cir. 1999); 20 C.F.R. § 404.1520(d), (e).  The

15    ALJ can do this through the testimony of a vocational expert or by reference to the Commissioner's

16    Medical-Vocational Guidelines (the "Grids"). Tackett, 180 F.3d at 1100-1101; Osenbrock v. Apfel, 240

17    F.3d 1157, 1162 (9th Cir. 2000).

18            An ALJ's findings will be upheld if the weight of the medical evidence supports the hypothetical

19    posed by the ALJ. Martinez v. Heckler, 807 F.2d 771, 774 (9th Cir. 1987); Gallant v. Heckler, 753 F.2d

20    1450, 1456 (9th Cir. 1984).  The vocational expert's testimony therefore must be reliable in light of the

21    medical evidence to qualify as substantial evidence. Embrey v. Bowen, 849 F.2d 418, 422 (9th Cir. 1988).

22    Accordingly, the ALJ's description of the claimant's disability "must be accurate, detailed, and supported by

23    the medical record." Embrey, 849 F.2d at 422 (citations omitted).  The ALJ, however, may omit from that

24    description those limitations he or she finds do not exist. Rollins v. Massanari, 261 F.3d 853, 857 (9th Cir.

25    2001).

26            At the hearing, the ALJ posed a hypothetical question to the vocational expert, which contained

27    limitations substantially similar to those included in his assessment of plaintiff's residual functional capacity.

28    Tr. 232-33.  Plaintiff argues that because the ALJ's hypothetical question did not include all of her

exertional and non-exertional limitations, the vocational expert's response to that question, which indicated she would be capable of performing her past relevant work, has no evidentiary value.  However, because plaintiff does not set forth what exertional or non-exertional limitations she feels were improperly excluded, her argument here is given no credence.

Plaintiff next contends that the Commissioner failed to meet his burden of establishing that she was capable of performing other work existing in significant numbers in the national economy here, because when asked to assume her testimony was fully credible, the vocational expert testified that she would not be able to perform any work. Tr. 233.  However, although, as discussed above, the undersigned has found the ALJ erred in discounting plaintiff's credibility, and is remanding this matter for further administrative proceedings for that reason, it is not at all clear that the ALJ would be required to find plaintiff disabled based on that testimony, particularly in light of the dearth of medical evidence in the record concerning the period prior to her date last insured.  In any event, because the ALJ stopped at step four of the sequential disability evaluation process, there is no step five finding for the Court to review to determine whether or not the Commissioner in fact had met his burden of proof.

VIII.   The ALJ Was Not Required to Obtain the Testimony of a Medical Expert

Plaintiff argues the ALJ should have called a medical expert to testify at the hearing pursuant to SSR 83-20 and Armstrong, 160 F.3d at 589-90, because there is some question as to the proper onset date of her alleged disability.  The ALJ's failure to comply with SSR 83-20 and Armstrong, plaintiff asserts, requires reversal and remand.  The undersigned disagrees.  As discussed above, SSR 83-20 comes into play only after the claimant has met the "ultimate burden" of proving disability prior to the expiration of his or her insured status. Armstrong, 160 F.3d at 590.  In other words, it is only when the claimant has established disability and the "record is ambiguous as to the onset date of disability," that SSR 83-20 require the ALJ to "assist the claimant in creating a complete record" that "forms a basis for" establishing a disability onset date. Id.  Here, as explained above, because plaintiff has not yet established disability, the requirements of SSR 83-20 and Armstrong did not come into play.

IX.   This Matter Should Be Remanded for Further Administrative Proceedings

The Court may remand this case "either for additional evidence and findings or to award benefits." Smolen, 80 F.3d at 1292.  Generally, when the Court reverses an ALJ's decision, "the proper course,

except in rare circumstances, is to remand to the agency for additional investigation or explanation."
Benecke v. Barnhart, 379 F.3d 587, 595 (9th Cir. 2004) (citations omitted).  Thus, it is "the unusual case in which it is clear from the record that the claimant is unable to perform gainful employment in the national economy," that "remand for an immediate award of benefits is appropriate."  Id.

Benefits may be awarded where "the record has been fully developed" and "further administrative proceedings would serve no useful purpose."  Smolen, 80 F.3d at 1292; Holohan v. Massanari, 246 F.3d 1195, 1210 (9th Cir. 2001).  Specifically, benefits should be awarded where:

> (1) the ALJ has failed to provide legally sufficient reasons for rejecting [the claimant's] evidence, (2) there are no outstanding issues that must be resolved before a determination of disability can be made, and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited.

Smolen, 80 F.3d 1273 at 1292; McCartey v. Massanari, 298 F.3d 1072, 1076-77 (9th Cir. 2002).  Because issues still remain with respect to plaintiff's residual functional capacity and her capability of returning to her past relevant work, this matter should be remanded to the Commissioner for further administrative proceedings.  If on remand plaintiff is found to be incapable of returning to her past relevant work, then the Commissioner also should consider whether she can perform other work existing in significant numbers in the national economy at step five of the sequential disability evaluation process.

It is true the Ninth Circuit has held that remand for an award of benefits is required where the ALJ's reasons for discounting the claimant's credibility are not legally sufficient, and "it is clear from the record that the ALJ would be required to determine the claimant disabled if he had credited the claimant's testimony."  Connett v. Barnhart, 340 F.3d 871, 875 (9th Cir. 2003).  The Court of Appeals in Connett went on to state, however, it was "not convinced" the "crediting as true" rule was mandatory.  Id.  Thus, at least where findings are insufficient as to whether a claimant's testimony should be "credited as true," it appears the courts "have some flexibility in applying" that rule.  Id.; but see Benecke v. Barnhart, 379 F.3d 587, 593 (9th Cir. 2004) (applying "crediting as true" rule, but noting its contrary holding in Connett).[6]  Here, as explained above, it is not clear plaintiff's testimony should be credited as true, given the dearth of medical

---

[6] In Benecke, the Ninth Circuit found the ALJ not only erred in discounting the claimant's credibility, but also with respect to the evaluations of her treating physicians.  Benecke, 379 F.3d at 594.  The Court of Appeals credited both the claimant's testimony and her physicians' evaluations as true.  Id.  It also was clear in that case that remand for further administrative proceedings would serve no useful purpose and that the claimant's entitlement to disability benefits was established.  Id. at 595-96.

1    evidence in the record supporting her allegations of disabling work-related limitations during to and as of

2    her date last insured.

3    X.    Plaintiff's Request for Assignment to a Different ALJ on Remand

4         The requirements of due process demand "impartiality on the part of those who function in judicial

5    or quasi-judicial capacities." Schweiker v. McClure, 456 U.S. 188, 195 (1982).  Hearing officers who

6    decide social security claims are presumed to be unbiased. Id.  This presumption, however, "can be rebutted

7    by a showing of conflict of interest or some other specific reason for disqualification." Id.  The burden of

8    establishing such a disqualifying interest "rests on the party making the assertion." Id. at 196.  That party

9    must show "the ALJ's behavior, in the context of the whole case, was 'so extreme as to display clear

10   inability to render fair judgment.'" Rollins v. Massanari, 246 F.3d 853, 858 (9th Cir. 2001) (citing Liteky v.

11   United States, 510 U.S. 540, 555-56 (1994)).  In addition, "actual bias," rather than the "mere appearance

12   of impropriety," must be shown in order to disqualify an ALJ. Bunnell v. Barnhart, 336 F.3d 1112, 1115 (9th

13   Cir. 2003).

14        Plaintiff argues that in light of the ALJ's rejection of her credibility, it is doubtful he would be able

15   to fairly consider her disability claim if this matter is remanded for further administrative proceedings.  As

16   such, plaintiff requests the Court order assignment to a different ALJ.  The mere fact that the ALJ erred in

17   assessing plaintiff's credibility, however, is a wholly insufficient basis upon which to request assignment to a

18   different ALJ on the basis of bias or lack of impartiality.  Indeed, if this were the standard, than any time an

19   ALJ makes an error in determining credibility, would support a claim of unfairness.  This, though, is not the

20   proper standard.  That is, plaintiff instead must show that there was an actual conflict of interest or that the

21   ALJ's behavior was so extreme as to constitute actual bias.  She has not done so here.

                                    CONCLUSION

23        Based on the foregoing discussion, the Court should find the ALJ improperly concluded plaintiff

24   was not disabled, and should reverse the ALJ's decision and remand this matter to the Commissioner for

25   further administrative proceedings in accordance with the findings contained herein.

26        Pursuant to 28 U.S.C. § 636(b)(1) and Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 72(b),

27   the parties shall have ten (10) days from service of this Report and Recommendation to file written

28   objections thereto. See also Fed. R. Civ. P. 6.  Failure to file objections will result in a waiver of those

objections for purposes of appeal. <u>Thomas v. Arn</u>, 474 U.S. 140 (1985).  Accommodating the time limit imposed by Fed. R. Civ. P. 72(b), the clerk is directed set this matter for consideration on **June 8, 2007**, as noted in the caption.

DATED this 11th day of May, 2007.


Karen L. Strombom
United States Magistrate Judge

REPORT AND RECOMMENDATION
Page - 24